## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEIDRE ROBINSON,                          :
                                          :        Civil Action No. 04-0647
                Plaintiff,                :
                                          :
v.                                        :
                                          :
BANK OF AMERICA, N.A.                     :
                                          :
                Defendant.                :
_____:

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on the plaintiff's complaint filed pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et</u> <u>seq</u>. (2000), alleging discrimination based on

her pregnancy and retaliation.  Currently before the Court is the Defendant's Motion for

Summary Judgment [D.E. # 13], the plaintiff's opposition thereto, and the defendant's reply.

Based upon the parties' submissions and for the reasons set forth below, the Court grants, in part,

and denies, in part, the defendant's motion for summary judgment.

## I.      Background

The plaintiff began her employment with defendant Bank of America ("BOA") as a

personal banker at its Fort Walton Beach, Florida, Banking Center on September 13, 2001.

Complaint for Injunctive and Monetary Relief ("Compl.") ¶ 8; Plaintiff's Memorandum of Points

and Authorities in Support of Plaintiff's Opposition to Defendant's Motion for Summary

Judgment ("Pl.'s Mem.") at 2.[1]  The plaintiff's initial salary as a personal banker was $25,000 per

year.  <u>Id.</u>  While working at the Fort Walton Beach Banking Center, the plaintiff reported to

---

[1]The plaintiff did not number the pages of her memorandum in opposition to the defendant's summary judgment motion.  The Court therefore has numbered the pages for ease of reference based on the order in which they were presented to the Court .

Tammy Groth, the Banking Center Manager ("BCM").  Id.  After observing the plaintiff's

interactions with customers and her "business acumen," Ms. Groth felt that plaintiff "should

manage her own banking center" and recommended that she apply for a BCM position.  Id.

Based on Ms. Groth's recommendation, the plaintiff applied for a BCM position in the District of

Columbia.  Id.  Alvin Smith, a Regional Manger with BOA, interviewed the plaintiff over the

telephone and subsequently offered her the BCM position at the Washington Navy Yard Banking

Center ("WNYBC"), a new Military Banking Center that was scheduled to open in the Spring of

2002.  Id.; Defendant's Statement of Undisputed Material Facts ("Def.'s Facts") at 2.  In his

position "[a]s Regional Manager, Smith oversaw all of the Banking Centers in the East Region of

the Military Bank, including the Banking Centers in the Pentagon, the State Department, the

Census Bureau, the Aberdeen Proving Ground, and the Washington Navy Yard."  Pl.'s Mem. at

1.  The plaintiff accepted the promotion, which increased her salary to $38,000 per year, and

moved to the Washington, D.C. area in January of 2002.  Id. at 2.  Because the Navy Yard

Banking Center had not yet opened, the plaintiff was assigned to the State Department Banking

Center ("SDBC") to gain experience working in a Military Bank until the WNYBC was ready to

open.  Id.; Def.'s Facts. at 2.  Prior to working at the SDBC, the plaintiff did not have any

experience working in a Military Bank.  Pl.'s Mem. at 2.  While working at the SDBC, the

plaintiff was provided with the Military Bank manual and asked to review it, along with being

required to hire staff and prepare for the WNYBC's opening.  Id. (citing Exhibit ("Ex.") 1

(Deidre Robinson Deposition Transcript ("Robinson Tr.") at 58-59, 66).  In March 2002, the

plaintiff discovered that she was pregnant and immediately informed her supervisor, Alvin

Smith, of her condition.  Pl.'s Mem. at 3.

On March 29, 2002, the plaintiff received a Conference Report for "unprofessional and unacceptable behavior" regarding her daily tardiness in reporting to work,[2] and her failure to follow proper procedures when opening new accounts.  Id.;[3] Def.'s Facts. at 2.  According to the plaintiff, she was confused by the March Conference Report because Smith had already addressed her tardiness by arranging for a co-worker, Denise Gordon, to drive to work with the plaintiff "so she could learn the shortest ways to get to the Banking Center."  Pl.'s Mem. at 3 (citing Ex 1 (Robinson Tr.")) at 70.  And after learning routes that would take less time to travel to the SDBC, the plaintiff was able to arrive at work on time.[4]

While at the SCBC, the plaintiff's duties included preparing the new Navy Yard Banking Center for its opening.  With respect to the SCBC, the plaintiff was responsible for leading and managing operations, personnel and community relations "to achieve sales volume and profit objectives;" conducting and supervising "weekly information sessions for staff on bank policies, sales training and economic development;" and providing performance and salary reviews.  Pl.'s Mem. at 4.  On April 15, 2002, the WNYBC opened and the plaintiff was reassigned to began her work there as the bank's BCM.  Id.

On May 17, 2002, the plaintiff met with Smith to discuss a second Conference Report

---

[2]Apparently, the plaintiff was having difficulty getting to work on time because she was unfamiliar with the area.  Pl.'s Mem. at 3.

[3]The report noted that certain paper work had not been completed by the plaintiff.

[4]The March Conference Report also addressed other minor performance mistakes that the plaintiff's SDBC supervisor, Evelyn Alvarez, discovered; namely, an unprocessed check and several incomplete signature cards that had been found in the plaintiff's work area.  Pl.'s Mem. at 3-4.  The plaintiff explains that she discussed the signature cards with Smith at the meeting referenced in the March Conference Report, and that Smith told her that because she was still learning the Military Bank business that she should "not . . . worry about the Report" and promised to destroy it after she showed improvement by arriving at work on time.  Pl.'s Mem. at 3-4, Ex. 1 (Robinson Tr.) at 72-73.

addressing the plaintiff's practice of leaving work early, and for failing to follow proper bank

closing procedures.  Pl.'s Mem. at 5, Ex. 1 (citing Robinson Tr. at 99-100, Ex. 15 (May 17, 2002

Conference Report ("May Conference Report")).  The May Conference Report mandated

"[i]mmediate and sustained improvement" or else "further disciplinary actions may be taken, up

to and including termination."  Id.; Def.'s Facts at 3.  According to the plaintiff, Smith's real

concern in the May Conference Report was that the bank had closed with only one teller on duty,

but Smith understood that the plaintiff sometimes had to leave early to pick up her daughter from

after-school care.  Pl.'s Mem. at 5, Ex. 1 (citing Robinson Tr. at 99-100).  The plaintiff further

states that Smith gave her permission to leave early to pick up her daughter, and that he merely

objected to her leaving early every day.  Id.  After meeting with Smith, the plaintiff held a

meeting with the WNYBC staff to discuss the one teller concern and to ensure that the bank

would always close with at least two employees on duty.  Id.  The plaintiff also created a

schedule to guarantee that two employees would be at WNYBC when the bank closed, which,

according to the plaintiff, Smith approved. Pl's Mem. at 5, Ex. 1 (citing Robinson Tr. at 94, 104,

121).  Thereafter, from May, 2002 through August 14, 2002, the plaintiff received numerous

commendations from Smith regarding the excellent performance of the WNYBC team and her

own "great" work.  Pl.'s Mem. at 5.  Moreover, Smith issued regional status reports in April and

June of 2002 congratulating the WNYBC team for exceeding its goal of opening new checking

accounts by 310%.  Id. at 4 (citing Ex. 2 (Unemployment Hearing Transcript ("UH Tr.") dated

December 12, 2002)) at 78.

On August 8, 2002, Hope Russell, who was the Banking Center Manager at the Beards

Hill Plaza Shopping Center in Aberdeen, Maryland, authored an email on Smith's behalf to the

BCMs assigned to the banking centers in his region requesting their vacation dates so Smith

would know when they were on leave.  Pl.'s Mem. at 7.  Approximately one week later on

August 13, 2002, the plaintiff responded to Russell's email, requesting maternity leave from

December 16, 2002 through February 3, 2003.[5]  Id.; Compl. at 3.  The next day, the plaintiff

received a telephone call from Smith, asking her to come to his office.  Pl.'s Mem. at 7.  Smith

informed the plaintiff that "her performance as a Banking Center Manager was not meeting his

expectations."  Id.  Apparently, Smith had called the WNYBC at approximately 5:50 p.m. on the

prior day, but no one answered the telephone.  Def.'s Facts at 4.  And Smith confirmed from

another bank employee that the plaintiff had been closing the banking center early for "a while."

Id.  According to the plaintiff, on August 14, 2002, Smith informed her that she could either

accept a demotion as a personal banker or be given 30 days to look for a position with another

employer.  Id.  At the plaintiff's request, Smith granted the plaintiff 24 hours to consider the

alternatives.  Id. at 8.  The plaintiff then contacted the Bank's "advice and counsel line" and

spoke with Kim Prioleau, a "personnel generalist."  Id.  The plaintiff informed Prioleau of the

options that Smith had given her and told Prioleau that she "felt [that Smith] was taking action

against her because of her pregnancy and recent request for maternity leave."  Id.  After initially

expressing reluctance to Prioleau's request that Prioleau be given authorization to speak to

Smith, the plaintiff eventually granted Prioleau permission to do so.  Id.

On August 15, 2002, Smith contacted the plaintiff and told her to come to his office

---

[5] Russell testified that she never actually created the calendar, and did not act on the information the plaintiff sent to her regarding the plaintiff's maternity leave request, because Russell was not actively seeking to determine when coverage for vacationing managers was needed at that time, but rather was merely gathering information for the creation of the calendar.  Pl.'s Mem., Ex. 2 (UH Tr.) at 149-53, 165.

before she had the opportunity to initiate contact with him regarding her decision.  Id. at 9, Ex. 1

(citing Robinson Tr. at 142).  When the plaintiff arrived at Smith's office, he "indicated . . . that

he [had] tried to be nice but in light of [her] complaint to personnel, . . . [the plaintiff's] only

option at that point was to either accept the demotion or be terminated effective that day."  Id.

According to the plaintiff, she accepted the demotion because she could not afford to be without

health benefits in light of the impending birth of her child, which was the reason she wrote the

letter accepting the demotion as demanded by Smith.  Id.  The plaintiff states that she was

required to write the letter before leaving Smith's office, with the treat of being fired if she

declined to do so. Id.

Prior to assuming her new position as a personal banker, the plaintiff was temporarily

assigned to the Bank's Census Bureau Banking Center and was later permanently placed at the

Pentagon Banking Center ("PBC").  Id. at 10.  However, before assuming the permanent

position, the plaintiff allegedly received harassing telephone calls from Smith while she was still

at the Census Bureau facility.  Id.  For example, according to the plaintiff, Smith would call her

to inquire about unresolved WNYBC business but "his tone was accusatory, unprofessional and

disrespectful" and "[h]e would yell and scream at [the plaintiff] and hung up on her on several

occasions."  Id.  The plaintiff contends that Smith accused her of lying when she tried to explain

the circumstances of a teller's data entry error, although eventually it became clear that she had

not made a mistake in handling the situation.  Id.

The plaintiff transferred to the PBC sometime between the end of August and the first

few days of September, and worked under the supervision of BCM Denise Gordon.  Id.  On

September 4, 2002, Smith came to the PBC and met with the plaintiff and Gordon about flyers

and envelopes that had been found in the file cabinet plaintiff used when she worked at the

WNYBC.  Id. at 10-11.  Smith claimed that the names and addresses on the envelopes were those

of BOA customers.  Id. at 11.  The plaintiff acknowledged that the documents were used in

connection with a personal business she operated out of her home but informed Smith and

Gordon that she never used the Bank's customer information for her personal use, nor had she

engaged in non-Bank business while she was working at the WNYBC.  Id.  Concluding that the

plaintiff had not been truthful about her use of the Bank's customer information, the plaintiff's

employment was terminated the next day by Smith on the ground that she could no longer be

trusted.[6]  Id. at 14.  Gordon advised the plaintiff that if she had any question about her

termination she should contact Smith.  Id.  The plaintiff then filed this action.

## II.      Standard of Review

Summary judgment is appropriate when there is "no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A

genuine issue of material fact exists if "a reasonable jury could return a verdict for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge" when a judge is not sitting as the trier of facts.  Id.

---

[6]According to the defendant, the plaintiff's responses to Smith's questions about the documents were conflicting.  Def.'s Facts at 9.  Specifically, the plaintiff explained that although the flyers were for a business she operated from her home and that she has not used the Bank's customer information to conduct her personal business, the plaintiff could not explain why the flyers were in envelopes with BOA customer's names on them.  Id. Moreover, the plaintiff later claimed that the names on the envelopes were acquired from her former employment and that it was pure coincidence that some of the individuals' names on the envelopes were also those Bank customers.  Id. at 9-10.  Based on their conversation with the plaintiff, Smith and Gordon felt that the plaintiff could not be trusted, had conducted personal business on Bank time, and had used Bank customer information in connection with her personal business, which violated the Bank's Code of Ethics.  Id. at 10.

at 255.  The entry of summary judgment is appropriate after there has been "adequate time for

discovery . . .  [and the] party [against whom the motion has been filed] fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"[S]ummary judgment is a drastic remedy, [and therefore] courts should grant it with

caution so that no person will be deprived of his or her day in court to prove a disputed material

factual issue."  Greenberg v. Food & Drug Admin., 803 F.2d 1213, 1216 (D.C. Cir. 1986).  The

Court must approach summary judgment "with special caution in employment discrimination

cases."  Remedios Jose v. Hosp. for Sick Children, 130 F. Supp. 2d 38, 41 (D.D.C. 2000) (citing

Ross v. Runyon, 859 F. Supp. 15, 21-22 (D.D.C. 1994)).  Yet the "plaintiff is not relieved of her

obligation to support her allegations by affidavits or other competent evidence showing that there

is a genuine issue for trial."  Remedios Jose, 130 F. Supp. 2d at 41.  Summary judgment

accordingly is not appropriate, for example, where "the evidence presented on a dispositive issue

is subject to conflicting interpretations, or reasonable persons might differ as to its significance . .

. ."  Greenberg, 803 F.2d at 1216 (citations omitted).  Moreover, when reviewing the evidence,

the Court must draw "all inferences . . . in favor of the nonmoving party."  Coward v. ADT Sec.

Sys., Inc., 194 F.3d 155, 158 (D.C. Cir. 1999); Aka v. Wash. Hosp. Ctr, 156 F.3d 1284, 1295

(D.C. Cir. 1998).

## III.   Analysis

### A.   The Plaintiff's Pregnancy Discrimination Claim

"[U]nder Title VII, where . . . the plaintiff has no direct evidence of . . . prohibited

discrimination, the claim is analyzed under the three-step framework [established in] McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973)."  Hawley v. Blackboard, Inc., No. Civ. A. 03-656

(GK), 2005 WL 513496, at *6 (D.D.C. Mar. 3, 2005).  The McDonnell Douglas test assigns the

plaintiff the initial burden of establishing a prima facie case of discrimination by a preponderance

of the evidence.  Sullivan-Obst v. Powell, 300 F. Supp. 2d 85, 91 (D.D.C. 2004) (citation

omitted).  If the plaintiff successfully establishes a prima facie case of discrimination, "the

burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for the

employment action taken by the defendant.  Id.  Once the defendant presents a legitimate,

nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to demonstrate

that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext

for discrimination."  Id. at 91-92.  Under Federal Rule of Civil Procedure 56(c), "[t]he [C]ourt's

task [is] to ascertain, successively at each stage reached, whether any issue of material fact

emerge[s] authentically," granting summary judgment "only if all facts essential to the Title VII

claim . . . [are] free from genuine dispute, and all that remain[s] [is a] decision on a matter of

law."  Abraham v. Graphic Arts Int'l Union, 660 F.2d 811, 815 (D.C. Cir. 1981).

### 1.      The Plaintiff's Prima Facie Case

The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), "amended Title VII of the

Civil Rights Act of 1964 to clarify that the prohibition of Title VII against sex discrimination

included discrimination based on pregnancy."[7]  Milliner v. District of Columbia, 932 F. Supp.

---

[7]For the purposes of Subchapter VI of the Act, which is entitled Equal Employment Opportunities:

[t]he terms "because of sex" or "on the basis of sex" include, but are not limited
to, because of or on the basis of pregnancy, childbirth, or related medical
conditions; and women affected by pregnancy, childbirth, or related medical
conditions shall be treated the same for all employment-related purposes,
including receipt of benefits under fringe benefit programs, as other persons not

(continued...)

345, 350 (D.D.C. 1996).  In order to establish a prima facie case of pregnancy discrimination, the "plaintiff must show that: (1) she was pregnant and/or subject to a pregnancy-related condition; (2) she was qualified for the position at issue; (3) she was affected by an adverse employment action; and (4) the employment action occurred under circumstances that give rise to an inference of discrimination."  Id. at 350-51 (internal quotation and citation omitted).

The defendant argues that "the undisputed evidence precludes [the p]laintiff from establishing a prima facie case of discrimination."  Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("Def.'s Mem.") at 4.  The defendant does not dispute that the plaintiff was pregnant or that she was subjected to an adverse employment action during her pregnancy, but contests the plaintiff's qualifications for her position as a BCM.  First, the defendant asserts that the plaintiff "cannot establish that she was qualified for her job," i.e., "that she was meeting the Bank's legitimate expectations  at the time of her demotion and termination."  Id. (citations omitted).  In other words, according to the defendant, the plaintiff failed to meet the Bank's legitimate expectations by "allowing her Banking Center to close before its posted closing time even though she understood that the Bank requires that 30 days notice be given to customers of a change in the hours of the Banking Center . . .[in addition to] being warned in writing about leaving early."  Id. at 4-5 (citations omitted).  Additionally, the Bank contends that the plaintiff failed to meet its legitimate expectations by failing to "give a straight answer when questioned by her supervisors about very serious

---

[7](...continued)
> so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title [42 U.S.C. § 2000e-2(h)] shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k).

questions concerning her compliance with the Bank's Code of Ethics when these issues were brought to her attention." Id. at 5.  In this regard, the defendant explains that BOA requires all employees to comply with its Code of Ethics, and that the plaintiff's responses to her supervisors' questions regarding the envelopes and flyers found in her workspace at the WNYBC evidenced "serious questions concerning her compliance with the Bank's Code of Ethics when [the envelopes and flyers] were brought to her attention," therefore making her unqualified to work for BOA in any capacity, thus, justifying her termination.  Id.[8]  The defendant contends that, when questioned about the envelopes and flyers,  the plaintiff answered Smith's questions "with a series of changing stories," stating that the contradictory nature of her answers, coupled with "the fact that [she] did not seem to be concerned about the serious Code of Ethics concerns being raised" convinced Smith and Gordon "that they could no longer trust [the] [p]laintiff." Def.'s Facts at 8-10; Def.'s Mem. at 5.  Namely, based on the plaintiff's responses, Smith and Gordon "believed that [the] [p]laintiff had conducted personal business on Bank time and were not convinced that she had not used Bank customer information for personal purposes, both clear violations of the Bank's Code of Ethics," and thus grounds for her termination.  Def.'s Facts at 10.

In response, the plaintiff argues that she has established a prima facie case of discrimination.  First, the plaintiff notes that the parties agree that the plaintiff was pregnant and that she experienced an adverse employment action.  Pl.'s Mem. at 18.  However, in contrast to the defendant's position concerning her qualifications, the plaintiff contends that she "was

---

[8]The Code of Ethics prohibits BOA employees from conducting personal business "on Bank time," or from using "Bank customer information for personal purposes."  Def.'s Facts at 10.

qualified for the position," and that she was "vastly exceeding BOA's legitimate expectations of a BCM." Pl.'s Mem. at 18, 20.  The plaintiff recalls numerous occasions during her tenure at the WNYBC when she was commended by Smith for her excellent work as a BCM.[9]  Id. at 20.  In addition, she disagrees with the defendant concerning the circumstances surrounding the WNYBC's early closings and the alleged Code of Ethics violations.  Id. at 22.

The plaintiff contends that Smith gave her permission in June or July, 2002, to close the WNYBC early because of the anthrax attacks, thus asserting that Smith was aware that the WNYBC was closing before 6:00 p.m. and actually gave her permission to disregard the hours posted on the door without 30 days notice to the Bank's customers.  Id. at 6, 22.  And, because Smith gave her permission to close early, the plaintiff posits that he could not have been surprised to "discover" in mid-August 0f 2002 that the WNYBC was closing before 6:00 p.m., nor could he later use the permission he provided against her.  Id.  Moreover, the plaintiff contends that in addition to giving her permission to close the WNYBC early due the Navy Yard's anthrax alert, Smith gave her permission during the spring of 2002 to leave early so long as the Bank's closing was covered by someone else.  According to the plaintiff, permission was given to her to leave the WNYBC "at 5:30 or so to pick up her daughter from after-school care." Id. at 5-6.  The plaintiff references the May Conference Report as support for her position, arguing that Smith's reason for writing that Report was to ensure that the WNYBC would always have two employees present at the end of the work-day.  Id.  The plaintiff further states that she made a concerted effort to improve her performance after receiving the May Conference Report,

---

[9]See Pl.'s Mem. at 3 (which includes Plaintiff's LCvR7.1(h) Statement of Material Facts as to Which There are No Genuine Disputes at Issue) ¶ 6 (citing Pl.'s Mem., Ex. 2 (UH Tr.) at 78-80, 83-84, 86, 88-91, and 97).

creating a rotating schedule which Smith approved, to ensure that at least two employees would be present when the bank closed. <u>Id.</u> at 5-6. She therefore concludes that the defendant cannot use the May Conference Report as a basis for her demotion, because she addressed the problem raised by the Report. <u>Id.</u> at 5-6, 21.

With respect to the alleged Code of Ethics violation, the plaintiff argues that she never violated BOA's Code of Ethics. Pl.'s Mem. at 11 (citing Robinson Tr. at 186). The plaintiff states that she informed Smith and Gordon that "she never sent non-bank information to bank customers; . . . never conducted non-bank business on bank time," and "never accessed bank information to obtain the names and addresses that were on the envelopes Mr. Smith inquired about." <u>Id.</u> The plaintiff further contends that she explained to Smith and Gordon that she inadvertently brought the flyers and envelopes to work with her from home when the WNYBC opened, because she had Bank related material at home during the months when she worked at the SDBC. <u>Id.</u> And when the plaintiff realized she had inadvertently brought the materials to work, she put them in a drawer at the bank and forgot about them. <u>Id.</u> The plaintiff also disputes Smith's testimony that he told her` that the names and addresses belonged to Bank customers, and that she admitted to and apologized for placing customer information on the envelopes. <u>Id.</u> at 12; Def.'s Facts at 9-10. She explains that she did not get the names and addresses that were on the envelopes from Bank records, but rather the information came from her work as a real estate agent in Tyson's Corner, Virginia, prior to moving to Florida. Pl.'s Mem. at 11.

While the facts clearly demonstrate, as the parties agree, that the plaintiff was pregnant and that she was affected by an adverse employment action, the Court concludes that the plaintiff has failed to show that she was qualified for the position as a BCM. In order to support the

prima facie case requirement that the plaintiff "[is] 'qualified,' [the] plaintiff must show that [s]he met [her] employer's legitimate expectations." Remedios Jose, 130 F. Supp. 2d at 42 (citing Smith v. Chamber of Commerce, 645 F. Supp. 604, 607 (D.D.C. 1986)). Here, BOA expected that its BCMs would close their respective Banking Centers at the posted closing times. And if the Banking Center hours were going to be changed, 30 days notice was to be provided to the Bank's customers. Def.'s Mem. at 4-5. The defendant has provided uncontroverted evidence showing that the plaintiff did not satisfy these expectations. Specifically, the record evidence conclusively establishes that the plaintiff closed the WNYBC before the posted closing time of 6:00 p.m. without giving customers the required 30 days notice. Pl.'s Mem. at 5, Ex. 1 (citing Robinson Tr. at 104, Ex. 15 (May Conference Report)); Def.'s Facts at 5 (citing Def.'s Mem., Ex. 4 (Affidavit of Earl G. Watkins, Jr. ("Watkins Aff."))) ¶ 4.[10]  Additionally, despite the warning in the May Conference Report that she could face "disciplinary actions . . . up to and including termination" if she did not show "[i]mmediate and sustained improvement," the plaintiff persisted in departing the WNYBC before 6:00 p.m. Def.'s Facts at 4. The record evidence establishes that in mid-August of 2002, Smith learned that the plaintiff was still closing the Banking Center early. Id. He became aware of the situation when he called the WNYBC before 6:00 p.m. and no one answered the telephone. Id. The following morning, Smith spoke with another WNYBC employee who confirmed that "Ms. Robinson's practice was to close the Banking Center early and that the Banking Center had been closing approximately 30 minutes early for a while." Id. (citing Def.'s Mem., Ex. 4 ¶ 4.) Although the plaintiff asserts that Smith

---

[10]Earl G. Watkins, Jr. was a personal banker at the WNYBC when the plaintiff was the BCM there. Def.'s Mem., Ex. 4 ¶ 3.

was aware that she was closing the Banking Center early and approved an internal memorandum

granting her permission to leave early, there is no indication in the record of such approval after

the May Conference Report.  See generally Pl.'s Mem.  There is evidence in the record that

Smith allowed the plaintiff to leave early prior to issuance of the May Conference Report,

however, the plaintiff unequivocally acknowledges in her deposition that Smith expected her not

to leave the Banking Center early after the May Conference Report was issued.  Def.'s Mem., Ex.

1 (citing Robinson Tr. at 99-101); Def.'s Facts at 4.  After the conference with Smith following

issuance of the May Conference Report, the evidence establishes that the plaintiff did not meet

her employer's expectation that she would close the Banking Center at the designated time, not

earlier.  While the defendant acknowledges that the plaintiff performed well as a BCM and

received praise from Smith for her performance, this does not alter the fact that the Bank was not

being closed at the appropriate time.  And there is no dispute that the plaintiff consistently closed

the Banking Center early, despite an earlier warning to refrain from doing so and an admonition

that further disciplinary action would be imposed, including termination, if her conduct persisted.

Thus, because there is no dispute that the plaintiff continued to close the Banking Center early,

she failed to meet her employer's legitimate expectations.  Accordingly, this Court concludes that

the plaintiff has not established the third prong of a prima facie case of discrimination based on

pregnancy because she cannot establish that she was qualified for the position.[11]

 The final prong of a prima facie case for pregnancy discrimination requires the plaintiff to

---

[11]The defendant has proffered an additional argument that the plaintiff failed to meet its legitimate
expectations and was therefore not qualified because she violated the Bank's Code of Ethics by conducting personal
business on Bank time and by soliciting Bank customers in connection with her personal business.  Because this
Court has already concluded that the plaintiff failed to meet her employer's legitimate expectations for a separate
reason and therefore cannot establish a prima facie case of discrimination based on her pregnancy, it will not address
whether the plaintiff failed to meet the Bank's legitimate expectations with respect to the Code of Ethics violations.

show that "the employment action occurred 'under circumstances that give rise to an inference of discrimination.'" Milliner, 932 F. Supp at 350. The plaintiff states that "there is enough circumstantial evidence to establish a causal nexus between her pregnancy and the demotion, based on the time of [her] demotion as it relates to her request for maternity leave on August 13, 2002." Pl.'s Mem. at 19. In this regard, the plaintiff contends that "Smith decided to terminate [her employment] eight hours after she requested maternity leave." Id. However, despite the plaintiff's position, she has not demonstrated any circumstances that give rise to an inference of discrimination based on her pregnancy. Rather, the defendant has produced evidence showing that the plaintiff was demoted specifically because she failed to meet the Bank's legitimate expectations of its BCMs. Moreover, the plaintiff's claim that Smith decided to terminate her eight hours after she requested maternity leave is not consistent with the facts because Smith was unaware that the plaintiff had requested maternity leave at the time of her demotion. Def.'s Facts at 11 (citing Ex. 10 (Affidavit of Hope Russell)) ¶ 5. As indicated above, in response to an email authored by Russell (another BCM) about creating a regional calendar depicting when BCMs were on leave, the plaintiff communicated to Russell the dates when she would be on maternity leave. Pl.'s Mem. at 7. Because Russell did not understand the plaintiff's email to be a request for maternity leave, she did not communicate the plaintiff's statement about maternity leave to Smith. Id. Moreover, Russell was the plaintiff's peer and therefore was not the proper person to whom a request for maternity leave would be submitted. Id. And in fact, the plaintiff never discussed her request for maternity leave with her immediate supervisor (Smith). Def.'s Mem., Ex. 1 (citing (Robinson Tr. at 190.) Accordingly, the plaintiff has not presented any circumstances that would give rise to an inference of discrimination, and thus she has not

16

satisfied the final prong of a prima facie case for a pregnancy discrimination claim.

### 2.    The Defendant's Legitimate Nondiscriminatory Explanation

Even if the plaintiff had established her prima facie case, the defendant would

nonetheless prevail on the plaintiff's pregnancy discrimination claim because it has carried the

burden of demonstrating a legitimate, nondiscriminatory reason for the plaintiff's demotion.

McDonnell Douglas, 411 U.S. at 802.  "Evidence of discrimination that is 'merely colorable' or

'not significantly probative' cannot prevent the issuance of summary judgment."  Remedios Jose,

130 F. Supp. 2d at 41 (quoting Johnson v. Digital Equip. Corp., 836 F. Supp. 14, 15 (D.D.C.

1993)).  Thus, the defendant's burden is satisfied if it provides a legitimate, nondiscriminatory

reason for its decision.  St. Mary's Honor Ctr. v. Hicks, 507 U.S. 502, 507 (1993).  If the

defendant proffers an explanation worthy of credence, the plaintiff must then show by a

preponderance of the evidence that the defendant's asserted legitimate reason is a "pretext" for

discrimination by either a direct showing that it was highly probable that the defendant was

motivated by discrimination or by an indirect showing that the defendant's reason is pretextual.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Forman v. Small, 271

F.3d 285, 292 (D.C. Cir. 2001) (citing Cuddy v. Carmen, 762 F.2d 119, 122 (D.C. Cir. 1985)).

And "a reason cannot be proved to be 'pretext for discrimination' unless it is shown both that the

reason was false, and that discrimination was the real reason."  St. Mary's Honor Ctr, 509 U.S. at

515 (emphasis in the original).

Here, the defendant has produced evidence showing that the plaintiff was demoted

because she failed to meet the employer's legitimate expectations by consistently closing the

Banking Center she managed early.  This evidence satisfies the defendant's burden of providing a

non-discriminatory reason for its actions.  Gleklen v. Democratic Cong. Campaign Comm., Inc.,
38 F. Supp. 2d 18, 20 (D.D.C. 1999).  The plaintiff argues, however, that the evidence supports
her contention that the defendant did not provide a legitimate, nondiscriminatory reason for her
demotion because she was performing well as a BCM and Smith had given her permission to
leave early and to close the WNYBC before 6:00 p.m., which the plaintiff concludes supports her
conclusion that the defendant's complaints about the bank's operating hours and her early
departures were pretextual.  Pl.'s Mem. at 5-6, 19-23.  The plaintiff attempts to substantiate her
pretext claim by arguing that the problems outlined in the May Conference Report, which Smith
used as grounds to demote her, were resolved long before her demotion in August 2002.  Id. at
22.  The plaintiff also contends that Smith decided to either demote or terminate her within eight
hours of her maternity leave request, which she alleges Russell communicated to Smith.  Id.

     Despite the plaintiff's pretext claim, the evidence simply does not support her
contentions.  First, the May Conference Report clearly advises the plaintiff of the Bank's
expectations – that "disciplinary actions . . . up to and including termination" would occur if she
did not show "[i]mmediate and sustained improvement."  Pl.'s Mem. at 3, Ex. 1 (Robinson Tr.)
at Ex. 15 (May Conference Report).  The plaintiff attempts to place a different interpretation on
the May Conference Report and of what the Bank expected, i.e., "the May Conference Report
had to do with ensuring that WNYBC always had two associates present at closing," and that
Smith approved a schedule for staff coverage at closing, saying that "the schedule was fine as
long as the Banking Center was covered," Pl.'s Mem. at 5-6, thus concluding that her early
departure could not have been grounds for demotion, id. at 6.  However, the evidence does not
support this interpretation.  Rather, the defendant has produced evidence showing that the

plaintiff was demoted because she failed to meet the employer's legitimate expectations by consistently closing the Banking Center early despite being told that she would be disciplined for doing so. See Pl.'s Mem. at 5, Ex. 1 (citing Robinson Tr., Ex. 15 (May Conference Report) (mandating "[i]mmediate and sustained improvement" or "further disciplinary actions may be taken, up to and including termination.")  Consequently, the plaintiff has not shown by a preponderance of the evidence that the defendant's asserted legitimate non-discriminatory reason for her demotion was a "pretext" for discrimination. Reeves, 530 U.S. at 143; Forman, 271 F.3d at 292 (citation omitted).  Accordingly, the defendant is entitled to summary judgment on the plaintiff's pregnancy discrimination claim.

**B.     Retaliation**

The McDonnell Douglas burden shifting analysis also applies to Title VII cases involving retaliation. Bowie v. Gonzales, 433 F. Supp. 2d 24, 34 (D.D.C. 2006).  Thus the plaintiff must first establish a prima facie of retaliation before the burden shifts to the defendant to assert a legitimate, nondiscriminatory reason for its actions. Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999); Buggs v. Powell, 293 F. Supp. 2d 135, 147 (D.D.C. 2003) (Walton, J.).  If the defendant satisfies its burden, the plaintiff must then demonstrate that the defendant's legitimate, nondiscriminatory explanation is actually a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802.

**1.     The Plaintiff's Prima Facie Case of Retaliation**

"Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' and employee (or job applicant) because [she] has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding,

or hearing.'" Burlington N. and Santa Fe Ry. Co. v. White, ___ U.S. ___, ___, 126 S. Ct. 2405,

2410 (2006) (citations omitted). "To establish a prima facie case of retaliation, the plaintiff must

present evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an

adverse employment action against her; and (3) the adverse action was causally related to the

exercise of her rights." Holcomb v. Powell, 433 F.3d 889, 901-902 (D.C. Cir. 2006) (citing

Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000); Forkkio v. Powell, 306 F.3d 1127, 1131

(D.C. Cir. 2002); Brody, 199 F.3d at 452-53); Morgan v. Fed. Home Loan Mortgage Corp., 328

F.3d 647, 651 (D.C. Cir. 2003) (citations omitted). "The plaintiff's burden" of establishing a

prima facie case of retaliation "is not great[.] [T]he plaintiff 'merely needs to establish facts

adequate to permit an inference of retaliatory motive.'" Sullivan-Obst, 300 F. Supp. 2d at 92

(quoting Forman, 271 F.3d at 299). An employee's allegation of workplace discrimination

constitutes a statutorily protected activity where she alleges "discrimination based on race, color,

religion, sex, or national origin." Jones v. Billington, 12 F. Supp. 2d 1, 13 (D.D.C. 1997). An

adverse employment action occurs when an employee "experiences materially adverse

consequences affecting the terms, conditions, or privileges of employment or future employment

opportunities such that a reasonable trier of fact could find objectively tangible harm." Holcomb,

433 F.3d at 902; (citing Forkkio, 306 F.3d at 1130-31; Brody, 199 F.3d at 457).

The defendant concedes for the purposes of summary judgment only that the plaintiff

engaged in a protected activity when she spoke to the personnel generalist regarding her concern

that Smith may be discriminating against her based on her pregnancy, and that the plaintiff was

subjected to an adverse employment action when she was terminated. Def.'s Mem. at 7.

Therefore, the question is whether the plaintiff has established that a causal connection exists

between the statutorily protected activity and the employer's adverse action.  Morgan, 328 F.3d

at 651; Brody, 199 F.3d at 452 (citation omitted).  In other words, the question before the Court

is whether the plaintiff's complaint to Prioleau, the personnel generalist, contributed to the

decision to terminate the plaintiff's employment.  This causal connection between the statutorily

protected activity and the employer's adverse action "may be established by showing that the

employer had knowledge of the employee's protected activity, and that the adverse personnel

action took place shortly after that activity."  Milliner, 932 F. Supp. at 352 (quoting Mitchell v.

Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting in part McKenna v. Weinberger, 729 F.2d

783, 790 (D.C. Cir. 1984)).  To establish knowledge by the employer, the "[p]laintiff merely

needs to establish facts adequate to permit an inference of retaliatory motive."  Milliner, 932 F.

Supp. at 352 (quoting Mitchell, 759 F.2d at 86 (quoting in part McKenna, 729 F.2d at 790)).

Also, "[e]vidence of discriminatory or disparate treatment in the time period between the

protected activity and the adverse employment action can be sufficient to show a causal

connection."  Buggs, 293 F. Supp. 2d at 149 (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d

31, 38 (1st Cir. 2003).  "To qualify as a causal connection, however, the temporal proximity

between the employer's knowledge of the protected activity and the adverse personnel action

must be 'very close.'"  Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003) (quoting Clark

County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)) (noting that an adverse employment

action that occurs three or four months after a protected activity is not temporally close enough to

show a causal connection)); but see Buggs, 293 F. Supp. 2d at 149 ("[A] two-month time span

between the protected activity and the purported act of retaliation is sufficiently temporal in

proximity to give rise to an inference of discrimination." (citing Breeden, 532 U.S. at 273)).

Here the temporal proximity alone between the plaintiff's participation in protected

activity and the adverse employment action is sufficient to satisfy the causal connection

requirement.  However, there is other evidence in the record that also satisfies this requirement.

Specifically, the records shows that on two separate occasions – August 14 and 15, 2002 – the

plaintiff contacted then personnel generalist Prioleau to discuss the meeting she had with Smith

when he told her that she would be terminated unless she agreed to accept a demotion.  During

the plaintiff's calls to Prioleau, she discussed the early closing of the WNYBC and informed

Prioleau that on August 13, 2002, she responded to an email request for the days she desired to

take vacation by asking for maternity leave, explaining that she thought the request "may have

prompted [Smith] to reprimand her."  Def.'s Facts at 6-7; Pl.'s Mem. at 8, 24.  According to

BOA policy, an employee who thinks she has been the subject of employment discrimination

must report the incident to a personnel generalist, who is then required to investigate the

employee's allegations.  Pl.s' Mem. at 8; Pl.'s Opp'n, Ex. 5 (Deposition of Kimberlee Prioleau

("Prioleau Tr.") at 40-41.  It is undisputed that the plaintiff explained to Prioleau that she

believed Smith's actions were based on her pregnancy and her request to take maternity leave.

And it is also undisputed that Prioleau contacted Smith as part of her investigation of the

plaintiff's employment complaint.  Def.'s Facts at 7; Pl's Mem., Ex. 5 (Prioleau Tr.) at 40.  Yet,

the defendant submits that when Prioleau telephoned Smith she "did not tell Smith that [the

p]laintiff had attributed what was happening to her to discrimination based on her pregnancy or

her request for maternity leave."  Def.'s Facts at 7.  This version of what occurred when Prioleau

spoke to Smith is tenuous at best.  The Court cannot discount the plaintiff's testimony that Smith

knew that she had contacted Prioleau and complained that she may be a victim of discrimination

because of her pregnancy.  As discussed earlier, it was Prioleau's duty as a personnel generalist to investigate the plaintiff's discrimination complaint.  Nonetheless, Prioleau submits that she never even mentioned to Smith the plaintiff's concern that she was being discriminated against due to her pregnancy.  This explanation, coupled with the fact that the plaintiff was terminated approximately three weeks after her conversation with Prioleau, supports the plaintiff's claim of a causal connection between her protected activity and the subsequent adverse employment action.  Morgan, 328 F.3d at 651; Brody, 199 F.3d at 452.  Accordingly, the plaintiff has established a prima facie case of retaliation.[12]

## 2.    The Defendants' Legitimate Nondiscriminatory Explanation

If a plaintiff successfully establishes a prima facie case of retaliation, the defendant then assumes the burden of offering a legitimate, nondiscriminatory reason for the adverse employment action.  Sullivan-Obst, 300 F. Supp. 2d at 92.  The defendant satisfies this obligation if it can explain the reasons for the adverse employment action by providing evidence of a legitimate, nondiscriminatory reason for the action.  St. Mary's Honor Ctr., 509 U.S. at 509. "The purpose of placing this burden on the defendant is 'simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate

---

[12]The defendant also argues that the plaintiff has not established a causal connection because the plaintiff has not demonstrated that "the decision maker was aware of her alleged protected activity."  Def.'s Mem. at 7. (citations omitted).  Specifically, the defendant asserts that the plaintiff's supervisor at the Pentagon, Denise Gordon, who "took part in and concurred independently with the decision to terminat[e] [the] [p]laintiff" did not have any knowledge that the plaintiff had ever made a complaint against Smith, or that the plaintiff complained that she had been discriminated against as a result of either her pregnancy or the request for maternity leave.  Id.  The Court need not address this argument, having already concluded that the plaintiff has otherwise satisfied the causal connection requirement.  However, the Court notes that the fact-finder could reasonably infer that Smith had knowledge of the plaintiff's protected activity and that he was one of the decision makers who contributed to the decision to terminate the plaintiff's employment.  Thus, this argument is not convincing.

pretext.'"  Cuddy, 762 F.2d at 123 (quoting Burdine, 450 U.S. 248, 255-56 (1981)).  Then, in response to the defendant's proffered explanation, the plaintiff must show by a preponderance of the evidence that the employer's explanation is actually a "pretext" for discrimination, which can be demonstrated either directly by showing that it was highly probable that the employer was motivated by discrimination or indirectly by showing that the reason proffered by the employer is pretextual.  Reeves, 530 U.S. at 143; Forman, 271 F.3d at 292 (citing Cuddy, 762 F.2d at 122).

The defendant asserts that even if the plaintiff has established a prima facie case of retaliation, the BOA has satisfied its burden of providing legitimate, non-discriminatory, and non-retaliatory reasons for the plaintiff's termination.  Def.'s Mem. at 8.  The defendant contends that the plaintiff "was terminated because she could not give a straight answer when questioned by her supervisors concerning the very serious question about her compliance with the Bank's Code of Ethics when confronted directly with the Bank's concerns."  Def's Mem. at 8.  The defendant adds that Smith could have terminated the plaintiff from all employment with BOA in August 2002, due to her less than stellar performance as a BCM, but instead he "saved her job by allowing her to take the [p]ersonal [b]anker position without any loss in pay."  Id. at 6, 9.  Moreover, the defendant opines that "the fact that Smith did not terminate [the p]laintiff's employment in August, when he planned to do so, but rather allowed her to remain with the Bank as a [p]ersonal [b]anker, is inconsistent with any intent to discriminate against [the p]laintiff because of her pregnancy."  Id.  The defendant also points to the fact that Smith and the Bank have exemplary records with respect to how they have dealt with employees who request and take maternity leave.  Id. at 9.  Specifically, the defendant notes that two other women who worked for Smith were permitted to take maternity leave without incident, and that one of these

individuals was in the same position as the plaintiff and took maternity leave during the

plaintiff's pregnancy.  Id.

On the other hand, the plaintiff argues that the defendant's purported legitimate, non

discriminatory reason for terminating her employment with the BOA "is unworthy of credence"

because Smith's behavior toward her during the interval between her demotion to the personal

banker position and her last day of work at the PBC clearly indicated a hostile attitude toward

her.  Pl.'s Mem. at 27.  She also contends that she gave straightforward answers to Smith's

questions about the envelopes and flyers discovered at the WNYBC during her meeting with

Smith and Gordon.  Specifically, she contends that she clearly communicated to Smith and

Gordon "that she never sent non-bank information to bank customers; and she never conducted

non-bank business on bank time," nor did she "[]ever access[] bank information to obtain the

names and addresses that were on the envelopes Mr. Smith inquired about."  Id.  This stark

contrast in testimony raises issues of material fact because it is in direct conflict to the reason

offered by the defendant for the plaintiff's termination.  And this conflicting testimony raises

genuine issues of material fact, as their "resolution could establish an element of a claim or

defense and, therefore, affect the outcome of the action."  Sanders v. Veneman, 211 F. Supp. 2d

10, 14 (D.D.C. 2002) (citing Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 248).  Moreover,

there is a genuine issue of material fact "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Dunaway v. Int'l Broth. of Teamsters, 310 F.3d 758,

761 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248).  Thus, if factual issues can

"reasonably be resolved in favor of either party," there is  need for a trial.  Id.

Here, the defendant has not produced evidence that conclusively established that the

plaintiff violated the Bank's Code of Ethics.  The testimony on this point is conflicting as to whether the plaintiff solicited Bank customers, performed personal business on Bank time, and whether she gave candid answers when questioned about the flyers and envelopes.  Indeed, summary judgment is not appropriate, for example, where "the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance . . . ."  Greenberg, 803 F.2d at 1216 (citations omitted).  And because the Court must draw "all inferences . . . in favor of the nonmoving party,"  Coward, 194 F.3d at 158; Aka, 156 F.3d at 1295, summary judgment is not warranted in this situation.  Accordingly, the defendant's motion for summary judgment with respect to Count II of the complaint for retaliation is denied.

## IV.    Conclusion

_____For the foregoing reasons, the Court grants the defendant's motion for summary judgment on the plaintiff's pregnancy discrimination claim and denies the defendant's motion with respect to the plaintiff's retaliation claim.

**SO ORDERED** on this 29th day of September, 2006.[13]

REGGIE B. WALTON
United States District Judge

---

[13]An Order consistent with this opinion is being issued contemporaneously herewith.